## A96A1737. ELLIOTT et al. v. McDANIEL.
### (483 SE2d 104)

BLACKBURN, Judge.

Jerry C. McDaniel, Sr., sued James D. Elliott, Jerry Ann Elliott, and J & J Landfill, Inc. for fraud and misrepresentation, breach of fiduciary duty, and misappropriation of corporate opportunity. McDaniel also sued to have one lease set aside and for specific performance of another lease. The jury returned a verdict for McDaniel on all counts, and the Elliotts appeal.

The evidence shows that in November 1991, James Elliott and Jerry Ann Elliott sued Forsyth County to obtain a permit to operate an inert landfill. While the suit was pending, James Elliott approached McDaniel, a long-time friend and sometimes business partner, about the possibility of going into the landfill business together. When Forsyth County awarded James Elliott the landfill permit in late 1993, he and McDaniel agreed to form a corporation to operate the new business. J & J Landfill, Inc. (J & J) was subsequently incorporated on February 8, 1994. By allocation of stock, James Elliott owned 45 percent of the company, McDaniel 40 percent, and Glyndon Pruitt, an attorney who had represented the Elliotts in obtaining the permit, 15 percent. James Elliott served as president, McDaniel as vice-president, and Pruitt as treasurer. All three were directors.

Located on property leased by James Elliott from Jerry Ann Elliott for $1 per year, the landfill began operating in March 1994. The landfill's initial lease was dated November 30, 1993, and had been made from Jerry Ann Elliott to James Elliott for the purpose of obtaining the landfill permit. According to McDaniel, he and the Elliotts agreed that the landfill would operate on Jerry Ann Elliott's land for 20 years, and that J & J would sign a lease on the land for $1 per year for the 20-year time period. Pursuant to his agreement with James Elliott, McDaniel cleared and graded the site, obtained the necessary permits, and provided cash for start-up expenses.

As time passed and no lease was drawn up, McDaniel became concerned. He repeatedly asked both Elliotts and Pruitt to draft the long-term, low-cost lease. James Elliott had represented to McDaniel that Jerry Ann Elliott was his wife, that the land was in Jerry Ann Elliott's name as a mere formality, and that there would be no problem in executing the lease. However, no such lease was ever executed.

McDaniel continued to insist that the lease be drawn up, and in October 1994, Jerry Ann Elliott was voted in as vice-president of J & J. However, instead of executing the lease McDaniel asserts the parties agreed to, Jerry Ann Elliott informed the corporation that she would not be renewing the lease to James Elliott that she had pro-

vided to assist him in obtaining the landfill permit. She instead presented J & J a one-year lease for $3,000 per month with no option to renew. On November 28, 1994, James Elliott and Glyndon Pruitt adopted this lease over McDaniel's objection. James Elliott later informed McDaniel that Jerry Ann Elliott would be issuing no more leases, and that J & J would be shut down to "get [McDaniel] out of it." McDaniel filed suit, and some months later, Jerry Ann Elliott ordered J & J to vacate the premises at the expiration of the $3,000 per month lease.

1. James Elliott, Jerry Ann Elliott, and J & J allege in their first two enumerations of error that the trial court erred in failing to grant their motions to dismiss.[1] Jerry Ann Elliott also alleges that the trial court erred in failing to grant her subsequent motion for summary judgment.

The record indicates that the trial court converted the motions to dismiss into motions for summary judgment. See OCGA §§ 9-11-12 (b); 9-11-56. Although the trial court issued a certificate of immediate review of its denial of these four motions for summary judgment, this Court denied interlocutory review. "Once a case has been submitted to the jury and a judgment rendered on its verdict, the denial of a summary judgment motion is a moot issue." (Citations and punctuation omitted.) *Metromedia Steakhouses Co. v. Ray*, 219 Ga. App. 716, 717 (466 SE2d 618) (1995). The first two enumerations of error thus present nothing for appellate review.

2. In enumerations of error 3 through 5, James Elliott, Jerry Ann Elliott, and J & J enumerate as error various charges given by the court. Each contested charge was properly preserved by objection.

The Elliotts and J & J first argue that the trial court erred in charging the jury on an agent's apparent authority. McDaniel presented evidence that when James Elliott negotiated the 20-year oral lease for $1 per year, he was acting as Jerry Ann Elliott's agent. Before an agent may enter into an oral contract to procure a lease on land, as McDaniel alleges James Elliott did, the agent must possess his principal's written authority to do so. See *East Piedmont 120 Assoc., L.P. v. Sheppard*, 209 Ga. App. 664, 665 (434 SE2d 101) (1993). The Elliotts and J & J contend that James Elliott had no written authority from Jerry Ann Elliott to enter into the lease. In light of this fact, they allege that no charge on apparent authority should have been given. The record shows that the trial court charged the jury on both apparent authority and the necessity of an agent's writ-

---

[1] The Elliotts and J & J moved to dismiss on two grounds: the oral lease contract was void under the statute of frauds, and McDaniel failed to give the corporation written notice before instituting a shareholder's derivative suit. See OCGA § 14-2-742.

ten authority.[2]

With respect to James Elliott's written authority, contrary to the Elliotts and J & J's contentions, there was evidence adduced at trial of the written authority for James Elliott's agency. Specifically, the complaint filed by the Elliotts in Forsyth County to obtain the landfill permit names both James Elliott and Jerry Ann Elliott as "the owners and/or authorized agent of the owner" of the landfill property. Additionally, James Elliott had furnished McDaniel with a copy of these pleadings before McDaniel entered into the agreement with James Elliott to operate and lease the landfill. The jury would be authorized to find from this evidence that McDaniel entered into the contract with James Elliott, acting as agent for Jerry Ann Elliott, pursuant to Jerry Ann Elliott's written authority.

Although the charge on apparent authority may not have been authorized by the evidence, the jury was properly charged that an agent must possess the written authority of his principal before entering into a contract involving land. In light of the fact that there was evidence of James Elliott's written authority for agency, and reviewing the other evidence in the case and the jury charge as a whole, we find that any error in charging on apparent authority was harmless. This enumeration is therefore without merit.

The Elliotts and J & J's fourth enumeration of error alleges that the trial court erred in instructing the jury on actual and constructive fraud and misrepresentation. Although not indicated on appeal, the objection to these charges was made only as to Jerry Ann Elliott. Therefore, our review of this enumeration is limited accordingly.

Jerry Ann Elliott's only argument as to this enumeration is that the fraud and misrepresentation charges were erroneous because McDaniel suffered no damages. No recovery may be had for fraud without proof of damages. See *Centennial Life Ins. Co. v. Smith*, 210 Ga. App. 194, 195 (435 SE2d 498) (1993). Although he conceded that he received back from J & J more than his initial investment, he

---

[2] The trial court charged the jury in pertinent part as follows: "The authority of an agent in a particular instance need not be proved by an express contract. It may be established by the principal's conduct and course of dealing, and if one holds out another as his agent and by his course of dealing indicates that the agent has certain authority and thus induces another to deal with his agent as such, he is estopped to deny the agent has any authority which, as reasonably [deduced] from the conduct of the parties, the agent apparently has. However, one entering into such a contract executed by an agent [on] behalf of a purported principal is charged with notice that the agent's authority to execute the agreement is required by law to be in writing and is under a duty to inquire and ascertain whether such written authority exists and what the limits of the authority are, and such person is guilty of negligence in failing to make such an inquiry. It is a question to be decided under the facts of each case as to whether the complaining party is barred from obtaining relief because of his or her negligence in not ascertaining whether an agent, imbued by the principal with apparent authority, had actual written authority to enter into the contract."

presented some evidence of damages. For example, McDaniel's share of corporate profits was reduced when the business entered into the lease for $3,000 per month instead of the low-cost lease McDaniel testified the parties agreed to. Additionally, McDaniel was damaged by relying on the existence of a long-term lease because the business could not continue in existence without it. Based on this evidence, charges on theories of fraud and misrepresentation were authorized, and this enumeration is without merit. See *Goss v. Total Chipping*, 220 Ga. App. 643, 646 (469 SE2d 855) (1996) ("to justify a charge on any given subject . . . [i]t is sufficient if some evidence exists from which the jury may engage in a legitimate reasoning process to reach an inference on that point").

Finally, the Elliotts and J & J enumerate as error the trial court's charge to the jury on breach of fiduciary duty and misappropriation of corporate opportunity. The record reveals that objection to the charge was made only as to breach of fiduciary duty and only with respect to Jerry Ann Elliott. We limit our review accordingly. See *Fidelity-Phenix Ins. Co. v. Mauldin*, 123 Ga. App. 108, 111 (179 SE2d 525) (1970) ("[r]eview of a charge on appeal is limited strictly to the grounds of objection stated at the trial").

According to McDaniel, the landfill property was initially leased from Jerry Ann Elliott for $1 per year. Before J & J entered into its second lease with Jerry Ann Elliott, she had become vice-president of the company. Therefore, Jerry Ann Elliott was vice-president of J & J — and thus a fiduciary — when the company signed with her as lessor a $3,000 per month lease for one year with no renewal. Because the evidence shows that while she was a corporate officer and fiduciary, Jerry Ann Elliott rejected a lease she had purportedly already agreed to in favor of a lease more expensive for the corporation and more economically beneficial to herself, the charge on breach of fiduciary duty with respect to Jerry Ann Elliott was authorized. The trial court committed no error in so charging.

3. In enumerations of error 6 and 8, the Elliotts and J & J contend the trial court erred in recharging the jury and sending it back to the jury room for further deliberations as to fraud and breach of fiduciary duty after the first verdict was returned. The first verdict was for McDaniel on all counts. On the fraud count, McDaniel was awarded attorney fees in the amount of "all dollars," expenses of litigation, and punitive damages. No award of actual damages was made to support the award of punitives. With respect to breach of fiduciary duty, McDaniel was awarded expenses of litigation, attorney fees, and punitive damages, as well as general damages in the amount of "[40] percent of all defendants' legal fees." No testimony had been adduced at trial as to what the amount of defendants' legal fees might be.

The court declined to accept the verdict and opted to recharge the jury. The jury was instructed as to actual damages and was told that any award made needed to be in a specific dollar amount. The jury was also told to consider the damages charge together with the other charges, not to give undue weight to the damages charge, and that the court was making, "no inference, no suggestion to you as to whether or not there should be any award or if there is an award, what amount that should be. That is all entirely within the province of the jury and the Court makes no suggestion to you as to what that should be or if it should be. . . . I'll ask you to recommence your deliberations and return a verdict which speaks the intent of the jury." The second verdict awarded McDaniel $14,400 in actual damages for fraud and $25,000 attorney fees for fraud. McDaniel was also awarded $25,000 damages for breach of fiduciary duty, although the second time the jury declined to award attorney fees for breach of fiduciary duty.

The Elliotts and J & J contend that giving the recharge was error, as it amounted to directing a verdict for damages in some amount. We disagree. The practice of recharging the jury where attorney fees and punitive damages are awarded but actual damages are not has previously been upheld. See *Northside Motors v. O'Berry*, 167 Ga. App. 155, 157-158 (305 SE2d 894) (1983). Additionally, "it is not only the right but the duty of the trial judge, when a verdict as returned is ambiguous or indefinite, to call the attention of the jury to the faults of the verdict, ask them what they mean by the verdict or answers returned, and, upon ascertaining what is meant, to direct them to return to [the jury] room and correct the verdict so as to make it speak their meaning. A judge has supervision of the whole case, and is not merely a figurehead to sit by and see injustice done or allow the reception of an ambiguous or indefinite verdict which is likely to give rise to more litigation or to result in another long and weary trial." (Punctuation omitted.) *Wadlington v. Wadlington*, 235 Ga. 582, 583-584 (221 SE2d 1) (1975).

No error appearing from the charge itself, and no error resulting from the recharge and additional deliberations of the jury, these enumerations are without merit.

4. The Elliotts and J & J's seventh enumeration of error contests the award of specific performance with respect to the $1 per year lease. Jerry Ann Elliott was ordered to execute and convey a lease for $1 per year for 20 years to J & J. The Elliotts and J & J contend J & J never sought such relief, and that specific performance is contrary to the statute of frauds and not justified by the evidence.

With respect to the propriety of our reviewing an appeal from a judgment for specific performance, "[t]his court is without jurisdiction to consider a claim sounding in equity *unless* the relief sought is

merely incidental to an underlying legal question." (Emphasis in original.) *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga. App. 495, 498 (455 SE2d 601) (1995). In this action, McDaniel sued for damages for fraud, misrepresentation, breach of fiduciary duty, and misappropriation of corporate opportunity. These counts turn on the existence and enforceability of the contract entered into between James Elliott and McDaniel, issues which the jury found for McDaniel and which we have determined as a matter of law on appeal. As specific performance of the lease is incidental to these legal questions, this case is proper for our review.

With respect to the contention that J & J never sought specific performance of the lease, McDaniel clearly brought a shareholder's derivative suit on behalf of J & J as to some counts, and in that suit McDaniel requested specific performance of the lease. This argument is therefore without merit, and it will not bar specific performance of the lease.

As regards the statute of frauds and the evidence supporting the decree of specific performance, the jury was instructed as to the requirements for awarding specific performance on an oral contract for land. The jury was charged in part that, "[s]pecific performance of a parol contract as to land shall be decreed . . . if the contract has been so far executed by the party seeking relief and at the instance or by the inducements of the other party that if the contract were abandoned he could not be restored to his former position." OCGA § 23-2-131. There is ample evidence in the record to support a finding that McDaniel executed most or all of his portion of the contract, which he testified included establishing the landfill and procuring the lease, and that he did so at the instance or inducements of James Elliott. Whether or not McDaniel could be restored to his former position with an award of money damages, however, presents another issue. The award of damages which the jury made to McDaniel in this case notwithstanding, McDaniel testified that he had been paid back for all the money and services he invested in commencing the landfill. McDaniel does not argue on appeal that an award of money damages is insufficient, and in light of all the evidence adduced at trial, we cannot say that money damages did not restore McDaniel to his former position. Therefore, the award of specific performance was not merited and must be reversed.

5. The Elliotts and J & J contend the evidence did not authorize or justify the jury's award of punitive damages. In the second portion of the bifurcated trial, the jury awarded McDaniel $650,000 in punitive damages for fraud and $250,000 each for breach of fiduciary duty and misappropriation of corporate opportunity. As between breach of fiduciary duty and misappropriation of corporate opportunity, McDaniel elected to receive the punitive damages award for the

latter.[3]

"Clear and convincing evidence of a defendant's willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences is required to warrant the imposition of punitive damages. OCGA § 51-12-5.1 (b)." (Punctuation omitted.) *Bartja v. Nat. Union Fire Ins. Co. &c.*, 218 Ga. App. 815, 818 (463 SE2d 358) (1995). The evidence showed that although James Elliott had a landfill permit, he used McDaniel to obtain cash, equipment, and specialized knowledge to get a landfill started. The jury could conclude that once the landfill became profitable, James Elliott decided he no longer needed McDaniel and took steps to oust him from the business. There was also sufficient evidence for the jury to find that by manipulating the lease of her property, James Elliott and Jerry Ann Elliott sought to close down the landfill, eject McDaniel from the business, and reopen the landfill without him. This evidence supports an award of punitive damages. The evidence in support of the punitive damage award notwithstanding, the *amount* of punitive damages awarded must be addressed. "Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant." OCGA § 51-12-5.1 (c). OCGA § 51-12-5.1 (g) limits awards of punitive damages by the imposition of a $250,000 cap for such awards for "any tort action" not provided for by subsection (e) (products liability actions) or subsection (f). See *Johnson v. Raatz*, 200 Ga. App. 289, 292 (407 SE2d 489) (1991).

The Georgia law of punitive damages contemplates the division of such damages into those involving products liability actions on which there is no cap for the amount of the award of such damages (OCGA § 51-12-5.1 (e)) and any other tort action for which there is a $250,000 cap on the amount of the award of such damages (OCGA § 51-12-5.1 (g)).

Georgia law further exempts from the cap limitation of OCGA § 51-12-5.1 (g), which would otherwise be applicable to such cases, those tort actions in which the trier of fact *finds* that the defendant acted, or failed to act, with the specific intent to cause harm to the plaintiff. See OCGA § 51-12-5.1 (f). OCGA § 51-12-5.1 (f) and OCGA § 51-12-5.1 (g) both provide punitive damages for the same general category of torts. The subsections differ, however, in that subsection (g) with its $250,000 cap is the subsection generally applicable to non-products liability actions in which punitive damages are authorized, while subsection (f) is applicable only to such actions in which

---

[3] McDaniel consented to elect between the punitive awards for misappropriation of corporate opportunity and breach of fiduciary duty in order to avoid a double recovery, as both awards were premised upon the same acts or omissions by the Elliotts.

it is found that the defendant's specific intent to harm the plaintiff authorizes the exemption of such action from the application of subsection (g) and its $250,000 cap.

In order to authorize the application of subsection (f) and the removal of the $250,000 cap on punitive damages in this non-products liability action, there must be a finding by the trier of fact that the defendant acted, or failed to act, with specific intent to cause harm. While such finding might be inferred where the evidence and the verdict would permit no other result, the finding of specific intent to harm in this case involves the weighing of evidence by the jury. The specific intent to harm may not be inferred by the trial court based on the amount of the award inasmuch as the jury may not be informed of the cap on punitive damages. See *Uniroyal Goodrich Tire Co. v. Ford*, 218 Ga. App. 248, 254 (461 SE2d 877) (1995).

It is the trial court which must determine as a matter of law, whether subsection (f) or (g) applies, based upon the specific finding of the jury. The interpretation of a statute is a question of law, not a question of fact. *New Era Publishing Co. v. Guess*, 231 Ga. 250, 254 (201 SE2d 142) (1973).

The jury's resolution of the specific intent to harm issue could be determined by a special verdict form or by the use of special interrogatories. In this case, no finding of specific intent to harm was made by the jury or communicated to the trial court and is not demanded by the evidence and the verdict. No request for such finding was made by the plaintiff who stood to benefit by the removal of the subsection (g) cap and whose burden it was to seek such determination. In this case, absent a finding by the jury of a specific intent by the defendants to harm the plaintiff, the trial court would have no basis to apply subsection (f) and allow the capless punitive damages award to stand. Therefore, subsection (g) applies and the punitive damage award must be limited to the $250,000 cap provided by OCGA § 51-12-5.1 (g). On remand, the trial court is directed to amend its judgment to conform with this opinion.

*Judgment affirmed in part, reversed in part, and remanded with direction. Beasley, C. J., and Birdsong, P. J., concur.*

DECIDED NOVEMBER 13, 1996 —
RECONSIDERATION DENIED FEBRUARY 26, 1997 —

*Robert E. Andrews*, for appellants.
*James D. Sexton, Giles D. Sexton*, for appellee.